UNITED STATES, Appellee,

v.

James L. CUNNINGHAM, Private, U. S. Army, Appellant.

Dkt. No. 38,479.
SPCM 14159.

U. S. Court of Military Appeals.

June 29, 1981.

FOR THE PURPOSE OF AGGRA-
VATION IN THE PRESENTENC-
ING PORTION OF THE TRIAL?

Now we conclude that neither of the two claims requires reversal of the appellant's conviction, so we affirm.

For Appellant: *Captain Charles E. Trant* (argued); *Colonel Edward S. Adamkewicz, Jr., Major Elliot J. Clark, Jr.* (on brief); *Lieutenant Colonel John F. Lymburner.*

For Appellee: *Captain Thomas E. Booth* (argued); *Major Ted B. Borek, Captain Charles A. Cosgrove, Captain Paul G. Thomson, Captain Glenn D. Gillett* (on brief); *Colonel R. R. Boller, Major David McNeill, Jr., Captain Brian X. Bush.*

*Opinion of the Court*

EVERETT, Chief Judge:

On April 26 and May 4, 1979, appellant was tried at Fort Knox, Kentucky, before a military judge sitting as a special court-martial. Contrary to his pleas, he was convicted of possessing marihuana, in violation of Article 134 of the Uniform Code of Military Justice, 10 U.S.C. § 934. He was sentenced to a bad-conduct discharge, confinement at hard labor for 3 months, and forfeiture of $240.00 pay per month for 6 months. After his conviction was upheld by all intermediate reviewing authorities, we granted review (9 M.J. 22) of these two issues:

I. WHAT EFFECT, IF ANY, DOES IT HAVE ON LTC BALDWIN'S PROBABLE CAUSE DETERMINATION THAT HE DID NOT KNOW THE BASIS FOR 1SG GONZALES CONCLUDING THAT THE ODOR HE DETECTED WAS THAT OF BURNING MARIHUANA?

II. WHETHER THE MILITARY JUDGE ERRED BY ACCEPTING INTO EVIDENCE PROSECUTION EXHIBITS 4 AND 5, RECORDS OF NON-JUDICIAL PUNISHMENT

I

The crucial question underlying the first issue is whether the facts known to Lieutenant Colonel Baldwin gave him probable cause to believe that "additional marihuana" was located in appellant's room. If Baldwin did have "reasonably trustworthy information . . . sufficient . . . to warrant a man of reasonable caution in the belief that" this contraband was located in the room, *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925); para. 152, Manual for Courts-Martial, United States, 1969 (Revised edition), then, as the commanding officer, he could authorize the search which his first sergeant had requested. In turn, the seizure of 74.84 grams of marihuana from appellant's wall locker during the ensuing search was lawful,[1] and appellant's motion to suppress was properly overruled by the military judge.

In determining whether there was probable cause to authorize a search, we "may consider *only* information brought to the [commander's] attention" before he authorized the search. *See Aguilar v. Texas*, 378 U.S. 108, 109 n.1, 84 S.Ct. 1509, 1511, n.1 12 L.Ed.2d 723, 725, n.1 (1964). Thus, in the case at hand, we may only consider the information which, according to the testimony of First Sergeant Gonzales and Lieutenant Colonel Baldwin, had been brought to Baldwin's attention when he authorized the search.

Gonzales was First Sergeant of the Medical Holding Company, a unit located on Ward 7–A at the Ireland Army Hospital at Fort Knox; it consisted chiefly of soldiers who "technically" were patients of the hospital, being reevaluated for continuance on

---

**1.** On this appeal the appellant does not claim that the search exceeded its constitutionally permissible scope. *See Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

active duty or being "administered physical profiles limiting their type of duty or possibly reclassification." At about 6:00 p. m. on the evening of February 7, 1979, Gonzales happened to "[j]ust ... stop in [to] check with the CQ and [to] see if all was quiet" in his unit's billeting area and make "[j]ust a routine check." As the First Sergeant walked down the corridor of Ward 7–A toward the living quarters of the ward, "about halfway down the corridor, [he] smelled incense burning and over that" he smelled an odor he thought was "marihuana smoke." As he "continued walking down the corridor until [he] got to the door leading into the living area ... the odor was more permanent or stronger." He then determined that the odor was emanating from appellant's room, which was the first room on the right side in the living area.

When Gonzales attempted to enter the room, he found that, contrary to unit policy, the door was locked.[2] He knocked on the door and identified himself after being asked to do so. Then someone inside unlocked the door; and Gonzales entered the room, where he observed several individuals, including the appellant, watching television and even detected "a ... much stronger odor of the burning marihuana." He then told everyone in the room to remain where they were while he summoned the military police.

When a military policeman arrived approximately 15 minutes later, First Sergeant Gonzales explained to him what had happened. Initially, the policeman was not satisfied that "probable cause" existed to search the room, but, after walking around the room and finding, in plain view, an ashtray containing marihuana seeds and partially consumed marihuana cigarettes, he then concluded that "probable cause" existed. Gonzales also had personally observed that "there was an ashtray approximately the middle of the table with three or four marihuana roaches and there were seeds in the ashtray and on the table."

In order to obtain authorization to search the room for marihuana, Gonzales left the room to call the commander, LTC Baldwin. As to "exactly what [he] told Colonel Baldwin" during their telephone conversation, he testified:

I told him that I was on my way bowling; I stopped by the barracks to check the area out and that I smelled the incense about halfway down the hallway and I thought I smelled marihuana through the incense and as I got down closer to the room I smelled the stronger odor of marihuana; walked in to the living area, tried the door and at that time the military policemen had arrived and he'd found or had seen marihuana remains and seeds in the ashtray and on the table and the MP informed me that that was probable cause and now I needed permission; he would have to give permission to have the room searched.

However, when Gonzales was asked on cross-examination, "Did [LTC Baldwin] have any reason to know or believe that [he] knew what marihuana smelled like?" and "Had [he] previously pointed out marihuana smoke to him?", his reply was in the negative.

LTC Baldwin then testified to the information that he had actually received and had relied on in authorizing the search of the appellant's room for "additional marihuana." This information consisted of even more details. He averred that First Sergeant Gonzales had called him at home around 6:00 p. m.,

[a]nd he stated that there had been an incident at the hospital, that he had been on his way to the bowling alley and stopped by Medical Holding Company area and that he had detected while there what he thought to be the smell of marihuana smoke, and that he had called the Military Police and that he needed my permission to have them do a search of the area for marihuana; said that it seemed what looked like or appeared to

---

**2.** First Sergeant Gonzales testified at trial that the doors were not "supposed to be locked at night" and that his men had been so informed.

He also stated that locked doors constituted "a fire hazard" in the hospital.

him to be the butts of marihuana cigarettes on the table in one of the rooms and that there were several of the members of Medical Holding Company in the room.

He also testified that First Sergeant Gonzales was a "very reliable" person and that he had felt that the information from him was "[a]bsolutely" reliable.

Finally, on cross-examination LTC Baldwin testified that, while he was not "aware of whether or not [his] First Sergeant ever smelled marihuana smoke before" and while he "didn't ask him whether he had smelled it before or not," nevertheless he still believed that there was more marihuana in the room because:

> Well he [1SG Gonzales] said that he'd seen the butts in the ashtray and that there were—there were several men in the room and they were sitting around and it seemed like some sort of a party or a gathering which to me or at least I had the picture in my mind anyway to—and we must have discussed it I guess.
>
> *   *   *   *   *   *
>
> —well, in my mind I was thinking that if they were sitting around smoking marihuana that there was possibly some marihuana elsewhere in the room, yes, other than on their persons.
>
> *   *   *   *   *   *
>
> [J]ust based on the circumstances of what he told me; the odor, the butts in the ashtray and he—he said that there were other men in the room other than the ones who lived there and that sort of thing and so that I came to that.
>
> *   *   *   *   *   *
>
> Well, the attention was on that room because the smell according to him, he smelled smoke coming from that room and he saw what he thought to be butts of marihuana cigarettes in the ashtrays in that room, and there were parties in that room other than the ones who lived there, and to me that would give the appearance perhaps of a party, a marihuana party or whatever going on and if that was all that was seen, perhaps there

was more in the room, and I suppose they didn't expect him to be there to smoke.

After hearing testimony of Gonzales, Baldwin and other witnesses, including the appellant, and after extensive argument by counsel, the military judge denied the defense motion to suppress the evidence obtained from appellant's wall locker during the search. Subsequently, pursuant to paragraph 74*I* of the Manual for Courts-Martial, *supra*, he made these special findings:

a. There was probable cause to believe that marihuana would be found in the room where PV1 Cunningham was found on 7 February 1979.

b. The information given to the commander who authorized the search which amounted to probable cause included:

1) 1SG Gonzales, a trusted and reliable senior non-commissioned officer, had smelled marihuana smoke coming from the room.

2) The room was a ward in the hospital, and the occupants of the room were patients in the hospital. The door was locked when it was not supposed to be, and the occupants did not immediately open the door.

3) Upon entering the room the strong odor of marihuana was present and marihuana cigarette butts were in plain view in the ashtray on the table in the middle of the room.

C. LTC Baldwin was neutral and detached beyond any reasonable doubt. Although LTC Baldwin was present at the scene of the search, his presence had absolutely no prosecutorial or law enforcement overtones.

d. Permission was requested and given to search the room for marihuana. Clearly, the specificity and scope were appropriate.

## II

In *Johnson v. United States*, 333 U.S. 10, 13, 68 S.Ct. 367, 369, 92 L.Ed. 436, 440 (1948), the Supreme Court stated that: "If the presence of odors is testified to before a

magistrate and he finds the affiant qualified to know the odor, and it is one sufficiently distinctive to identify a forbidden substance, this Court has never held such a basis insufficient to justify issuance of a search warrant." Thus, obliquely the Court has acknowledged that a qualified person's recognition of the distinctive odor of a drug can provide probable cause for that person to believe the drug is present.

According to his testimony at trial, First Sergeant Gonzales was familiar with the odor of marihuana by reason of training he had received some years before at a school for non-commissioned officers. Therefore, when he detected in the hallway the odor of marihuana emanating from appellant's room, he had probable cause to believe marihuana was present within the room. Armed with probable cause, he might have been entitled to seek entry to the room for purposes of search or apprehension if "exigent circumstances" existed. *See United States v. Hessler*, 7 M.J. 9 (C.M.A.1979). Since evidence of drug activity is often quite evanescent and destructibility of evidence bears some relation to reasonableness of a search,[3] the Government might then have possessed grounds for arguing that "exigent circumstances" existed if the first sergeant had entered to perform a search or apprehension.[4]

We need not confront that issue because Gonzales did not demand entry for such a purpose. Instead, he merely knocked on the door to seek entry. Of course, the policy of the Medical Holding Company that doors to the rooms be left unlocked—a policy apparently intended, among other things, to diminish fire hazards—placed the occupants of rooms in Ward 7–A on notice that they could not reasonably expect that no one would seek to enter their rooms without permission. Indeed, in a military barracks—or on the hospital ward where this company was housed—the occupants of rooms should rea-

sonably expect that from time to time certain officials—such as the commanding officer or the first sergeant—will enter in order to assure that the rooms are not being used as a depository for contraband or other materials that would impair combat effectiveness. *Cf. United States v. Middleton*, 10 M.J. 123 (C.M.A.1981).

When Sergeant Gonzales knocked on the door, identified himself and sought entry to the room, his actions probably did not constitute a "search," even within the broad scope of that term, as used in the Fourth Amendment. *See e. g., Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). If, however, such conduct be denominated a "search," it was not one for which probable cause was required at that point. *See, e. g., Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio, supra*. In short, First Sergeant Gonzales had done nothing unreasonable up to the time when he entered the room.

Upon opening the door, he found the odor to be even stronger. Several people were in the room, and it seemed clear that unlawful drug activity was afoot. Gonzales once again acted quite reasonably by telling those within the room to remain while he summoned the military police. Just as information not adequate to establish probable cause may authorize the invasion of privacy involved in a stop and frisk (*Terry v. Ohio, supra; see Adams v. Williams, supra*), information insufficient to establish probable cause may justify a law enforcement agent in briefly limiting the motion of suspects while the investigation is underway. *See United States v. Glaze*, 11 M.J. 176 (C.M.A.1981); *Rawlings v. Kentucky*, 448 U.S. 98, 110, 100 S.Ct. 2556, 2564 n.5, 65 L.Ed.2d 633, 645 n.5 (1980); Dutile, *Freezing the Status Quo in Criminal Investiga-*

---

**3.** *Cf. Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), concerning entry without notice to arrest for drug activity.

**4.** Of course, *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed.2d 436 (1947), held such a search to be illegal on very similar facts.

*tions: The Melting of Probable Cause and Warrant Requirements*, 21 B.C.L.Rev. 851 (1980). When the military police arrived, they observed marihuana cigarette butts in plain view in the ashtray on the table in the middle of the room. Gonzales made a similar observation.

█ Once more, the first sergeant acted in almost textbook fashion. He contacted the commanding officer, Lieutenant Colonel Baldwin, to obtain authority for searching the room. Although the phrasing of the issue which we granted in this case may imply that Baldwin's determination of probable cause depended solely on the representations by his first sergeant that there was an odor of marihuana in the room, the plainly visible marihuana cigarette butts also provided substantial evidence—communicated to the commander—justifying a finding of probable cause. In short, if Gonzales had entered the room lawfully, observed the marihuana cigarette butts, and communicated this observation to the commander, there might well be probable cause for the search even if the odor of marihuana had not been mentioned.

With respect to the defense complaint that Baldwin never asked Gonzales—and Gonzales never told his commander—how he was able to recognize the odor of marihuana, we are convinced this omission is of minimal significance under the circumstances of this case. When an experienced noncommissioned officer in a position of responsibility makes a statement to his commander that he has smelled the odor of marihuana, there is implicit in this statement an assurance that the declarant has some familiarity with the odor. In short, it would be inconsistent with the responsibilities of First Sergeant Gonzales—and his reliability as known to his commander, Lieutenant Colonel Baldwin—for Gonzales to state positively that he had smelled the odor of marihuana, unless he had some basis for identifying that odor.

5. Of course, there is widespread familiarity with the odor of marihuana in those parts of the military community where apparently it is

We note that there is precedent for this view. For example in *United States v. Lewis*, 392 F.2d 377 (2nd Cir. 1968), *cert. denied*, 393 U.S. 891, 89 S.Ct. 212, 21 L.Ed.2d 170 (1968), the Court of Appeals rejected a defendant's claim that the affidavit on which a search warrant was based had been defective because it stated "we detected a strong mash or alcohol odor emanating from cracks in and around the door," *id.* at 378 n.1, but failed to explain how the affiant, a Deputy United States Marshal, recognized the smell of alcohol. The Court remarked:

> Lewis argues that the affidavit does not support the warrant because it fails to state the Deputy Marshal's qualifications to recognize the odor of mash or alcohol. However, all that is necessary is that the affidavit set forth sufficient facts so that the Commissioner might make an independent assessment of the probability that the law was being violated on the premises to be searched.

*Id.* at 379. While the odor of alcohol is more widely known than that of marihuana,[5] the same principle has been applied where marihuana was involved. For example, in *Miller v. Sigler*, 353 F.2d 424 (8th Cir. 1965), *cert. denied*, 384 U.S. 980, 86 S.Ct. 1879, 16 L.Ed.2d 690 (1966), the Court of Appeals considered the weight to be given a police officer's statement to the magistrate that he had personally observed the odor of marihuana outside of the premises to be searched. The court rebuffed a contention of insufficiency in these terms:

> Petitioner complains there was no showing before the magistrate that Officer McAdams was competent to identify the odor of marijuana. This contention is likewise without merit. If the officer presented hearsay evidence to the effect that someone else had smelled marijuana, perhaps some indication of this person's competence might be required by the magistrate. But when the police officer states that he personally

used widely—albeit illegally. *Cf. United States v. Middleton*, 10 M.J. 123 (C.M.A.1981).

witnessed the odor of narcotics, the magistrate should not be required to examine the officer's competency. Probable cause is not absolute certainty. The magistrate was no doubt aware that metropolitan police officers are usually familiar with narcotics, and that marijuana has an odor that is not commonly found in an urban apartment. Therefore, when an officer personally states that he detected the odor of marijuana from a particular room in an apartment dwelling, certainly this is sufficient probable cause to issue the requested warrant for a search of the room without initiating an examination of the officer's ability to accurately distinguish between narcotics and other similar odors. In addition if petitioner's suggestion were followed it would add still another obstacle to effective law enforcement and further hamstring the police in their legitimate efforts to combat crime.

*Id.* at 427.

In *United States v. Ludwig*, 508 F.2d 140 (10th Cir. 1974), the Court of Appeals repelled an attack on a police officer's affidavit for its "failure . . . to establish his ability to recognize the odor of marihuana" by simply noting that "inherent in the officer's statement that he smelled marihuana is the claim that he is familiar with that substance's odor." *Id.* at 142. The court further explained:

At the motion to suppress the officer's familiarity with the odor of marihuana was firmly established. Had the contrary been established we would have a different case questioning veracity.

*Id.* at 142 n.1.

We must emphasize that a statement by a service member that he has smelled marihuana at some location will not always warrant a commander to find that marihuana is present at that location. Under some circumstances a commander will not be justified in proceeding without a searching inquiry as to his informant's experience with the odor of marihuana. Thus, in *United States v. Hood*, 7 M.J. 128 (C.M.A.1979), we concluded that an affidavit submitted in support of a search authorization was defective for failure to explain the affiant's qualifications to discriminate among different odors. However, under the circumstances of this case—including the cigarette butts which independently evidenced the smoking of marihuana—the commander was not required to pause for inquiry about Sergeant Gonzales' qualifications to identify marihuana.

### III

■ As to the appellant's second claim of error, we observe that our subsequent decision in *United States v. Mack*, 9 M.J. 300 (C.M.A.1980), has resolved this issue against the appellant. There a similar challenge was made concerning the admissibility of a record of non-judicial punishment during the presentencing phase of the accused's trial, but we held that, since the record had been properly completed, it was admissible as evidence. Likewise, in the case at hand, the two records of non-judicial punishment now in question had been properly completed and so were admissible as presentencing evidence.

### IV

The decision of the United States Army Court of Military Review is affirmed.

Judges COOK and FLETCHER concur.